UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

BERNHARD SCHULTE SHIPMANAGEMENT
(L) LIMITED

                                    Plaintiff,

        -v-

REFINED PRODUCTS SEAWAYS LIMITED,
MERCHANT MARINE MANAGEMENT S.A., and
MELODIA SHIPPING INC.

                                    Defendants.

------------------------------------------------------------------x

'09 CIV 7609

09 CV

**VERIFIED COMPLAINT**

09 CV 7609 (WHP)

        Plaintiff, BERNHARD SCHULTE SHIPMANAGEMENT (L) LIMITED

(hereinafter "BERNHARD SCHULTE" or "Plaintiff") by its attorneys, CHALOS & CO,

P.C., as and for its Verified Complaint against Defendant, REFINED PRODUCTS

SEAWAYS LIMITED (hereinafter "REFINED PRODUCTS"), MERCHANT MARINE

MANAGEMENT S.A. (hereinafter "MERCHANT MARINE") and MELODIA

SHIPPING INC. (hereinafter "MELODIA"), alleges upon information and belief as

follows:

<u>JURISDICTION</u>

        1.      The Court has subject matter jurisdiction by virtue of the underlying

claim herein being an admiralty and maritime claim within the meaning of Rule 9(h) of

the Federal Rules of Civil Procedure and within the admiralty and maritime jurisdiction

of this Court under 28 U.S.C. § 1333.

<u>THE PARTIES</u>

        2.      At all times material hereto, Plaintiff, BERNHARD SCHULTE, was and

still is a foreign business entity with its registered address at Lot 4, 2nd floor, Wisma

Kishan Singh No. U0229D Jalan Kemajuan, 87007, Federal Territory of Labuan, Malaysia and administrative address at 2602, K Wah Centre, 191 Java Road, North Point, Hong Kong.

3.      At all times material hereto, Defendant, REFINED PRODUCTS, was and still is a foreign business entity with a registered office at 80 Broad Street, Monrovia, Liberia and its place of business c/o Merchant Marine Management SA, 5K Paleologou Str, 185 35, Pireaus, Greece.

4.      At all times material hereto, Defendant, MERCHANT MARINE, was and still is a foreign business entity with a principal place of business at 5K Paleologou Str, 185 35, Pireaus, Greece.

5.      At all times material hereto, Defendant, MELODIA, was and still is a foreign business entity with a principal place of business at 5K Paleologou Str, 185 35, Pireaus, Greece.

## FACTS AND CLAIM

6.      On or about May 2, 2007, Plaintiff, BERNHARD SCHULTE[1], as ship manager, and Defendant REFINED PRODUCTS, as Owner, entered into a ship management agreement in connection with management services to be provided by BERNHARD SCHULTE to the Defendant's vessel, the M.T. PALENQUE. *A copy of the ship management agreement is attached hereto as Exhibit "1".*

7.      This ship management agreement is a maritime contract.

---

[1] The May 2, 2007 ship management agreement was originally entered into by "Eurasia International (L) Limited", as managers. Eurasia International (L) Limited later changed its name to "Bernhard Schulte Shipmanagement (L) Limited. *A copy of Addendum No. 01 to the Ship Management Agreement dated May 2, 2007 (reflecting this change of name) is attached hereto as Exhibit "2".*

8.     Pursuant to the terms and conditions agreed upon by the parties, either party could terminate the ship management agreement by two (2) months written notice to the other party. *See Exhibit "1" at clause 18.6.*

9.     The ship management agreement further provides for disputes to be referred to arbitration in London, with English law to apply. *See Exhibit "1" at clause 19.*

10.     In accordance with clause 18.6 of the ship management agreement, Plaintiff BERNHARD SCHULTE gave Defendant two (2) months written notice of its termination of the agreement on March 3, 2009. Notwithstanding this notification, REFINED PRODUCTS did not arrange any crew or change of management.

11.     Thereafter, the Condition of Class expired on April 19, 2009, during the loading of cargo at Fujariah for Iraq. Permission of Class was allowed for one (1) voyage to Iraq.

12.     Subsequently, the vessel was inspected to extend the Condition of Class, and was found to have certain hull defects and other technical problems.

13.     The vessel arrived at Kalba anchorage on June 5, 2009 to receive bunkers. A further inspection was conducted at that time to extend the Condition of Class. A "Certificate of Conveyance" was issued by the GL surveyor, valid until June 17, 2009, to allow one (1) voyage to Colombo for dry-docking.

14.     The vessel did not proceed to Colombo and the Certificate of Conveyance expired. REFINED PRODUCTS has failed, neglected and/or otherwise refused to provide BERNHARD SCHULTE with the necessary funds to conduct an additional survey to restore the vessel to Class.

15.    On July 10, 2009, the vessel's number 2 diesel generator suffered a breakdown. Thereafter, on July 23, 2009, REFINED PRODUCTS instructed the vessel to proceed to Karachi for demolition.

16.    However, REFINED PRODUCTS has failed to provide BERNHARD SCHULTE with the necessary bunkers and the necessary funds to repair the generator, which would enable the vessel to obtain approval of class to proceed to Karachi.

17.    The vessel has been at anchorage at Kalba since June 5, 2009 and, despite the termination of the ship management agreement on May 3, 2009, BERNHARD SCHULTE has suffered damages due to necessary repairs, crew wages, and provision of bunkers to the vessel. As of August 31, 2009, the total outstanding amount due and owing to BERNHARD SCHULTE is USD 524,318.55.

18.    Despite repeated demands for payment, Defendant REFINED PRODUCTS has failed, neglected and/or refused to make payment of said sums due and owing to Plaintiff BERNHARD SCHULTE.

19.    Pursuant to the terms of the ship management agreement, all disputes arising there under are to be submitted to London arbitration with English law to apply. Plaintiff has or shortly will commence arbitration.

20.    This action is brought in order to obtain jurisdiction over Defendant and also to obtain security for Plaintiff's claims and in aid of London arbitration proceedings.

21.    English law, including but not limited to Section 63 of the English Arbitration Act of 1996, provides that a prevailing party is entitled to interest, costs and legal fees.

22.     As best as can now be estimated, the Plaintiff BERNHARD SCHULTE expects to recover the following amounts in London arbitration from Defendant REFINED PRODUCTS:

| | | |
|---|---|---|
| A. | Principal claim: | *$ 524,318.55* |
| B. | Estimated interest on Principal claim: 3 years at 7.5%, compounded quarterly | *$ 118,445.11* |
| C. | Estimated attorneys' fees: | *$ 50,000.00* |
| D. | Estimated arbitrations costs/expenses: | *$ 50,000.00* |
| | **Total Claim** | **$ 742,763.66** |

23.     Therefore, BERNARD SCHULTE's total claim for breach of the maritime contract against Defendant REFINED PRODUCTS is in the aggregate USD 742,763.66.

24.     Defendants MERCHANT MARINE and MELODIA are receiving/paying agents of REFINED PRODUCTS, such that MERCHANT MARINE and/or MELODIA are now, or will soon be, holding assets belonging to REFINED PRODUCTS.

25.     On or about February 9, 2009, payments to Plaintiff, BERNHARD SCHULTE, for the services provided by Plaintiff to the vessel, were issued by MERCHANT MARINE on behalf of REFINED PRODUCTS. *A copy of the relevant payment credit advise is attached hereto as Exhibit "3".*

26.     MERCHANT MARINE is identified in the May 2, 2007 ship management agreement as the party to whom all communications to the Owners of the M.T. PALENQUE should be addressed. *See Exhibit "1" at p. 1.*

27.     On or about April 7, 2009 and July 22, 2009, payments to Plaintiff, BERNHARD SCHULTE, for services provided by Plaintiff to the vessel, were issued by

MELODIA on behalf of REFINED PRODUCTS. *Copies of the relevant payment credit advises are attached hereto as Exhibits "4" and "5", respectively.*

28.    It is not general practice in the maritime community, nor anywhere else, for independent companies to make or receive large payments on behalf of other independent companies.

29.    Payments sent or received on behalf of another independent company are suggestive of a relationship that is not "arms length."

30.    At all material times, Defendants MERCHANT MARINE and MELODIA have disregarded the corporate form of Defendant REFINED PRODUCTS to the extent that Defendants MERCHANT MARINE and MELODIA were actually carrying on REFINED PRODUCTS's business and operations as if the same were their own, or vice versa.

31.    Based on the foregoing investigation, there are reasonable grounds to conclude that the Defendants MERCHANT MARINE and MELODIA are "paying agents" and/or "alter-egos" of Defendant REFINED PRODUCTS and, therefore, Plaintiff BERNHARD SCHULTE has a valid prima facie *in personam* claim against Defendants MERCHANT MARINE and MELODIA based upon alter-ego liability.

## BASIS FOR ATTACHMENT

32.    Defendants cannot be found within this district within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but Defendants are believed to have or will have during the pendency of this action, certain assets, accounts, freights, monies, charter hire, credits,

effects, payment for bunkers, goods or services, bills of lading, cargo and the like belonging to, claimed by, or for the benefit of, the Defendants within this District held by various parties, as garnishees, including by not limited to electronic fund transfers.

33.     Defendants are continuously engaged in international shipping and conducts business in U.S. Dollars.  Nearly all companies engaged in the international shipping industry transact business in U.S. Dollars and therefore regularly have assets in New York City.  Dollars are the *lingua franca* of international commerce.

34.     All international U.S. dollar transfers are processed by intermediary banks in the United States, mainly in New York City.  The Clearing House Interbank Payment System represents that it processes 95% of those transfers.

35.     Plaintiff believes that some of these assets of Defendants, to wit: accounts; bank accounts; monies; charter hire; credits; debts owed to the defendants; effects; payments for bunkers, cargo, goods or services; debts; unmatured debts; bills of lading; payments from the purchasers of cargoes; freight and/or hire payments to or from owners of vessels, or charterers, to, from, or for the benefit of, Defendants and/or Clearing House Interbank Payment System (CHIPS) credits or funds being transferred through intermediary banks, are located in this District in the possession of garnishees, including: ABN AMRO BANK, Bank of America, Bank of China, Bank of New York, Bank of Tokyo Mitsubishi UFJ Ltd., Barclay's Bank, BNP Paribas SA, Calyon, Calyon Financial, Inc., Citibank N/A, Credit Suisse Securities (USA) LLC, Deutsche Bank, HSBC (USA), JPMorgan Chase Bank, Mashreqbank, Societe Generale, Standard Chartered Bank, UBS AG, U.S. Bank, Wachovia Bank,  and Wells Fargo Bank.

WHEREFORE, Plaintiff prays:

A.    That process in due form of law issue against the Defendants, citing them to appear and answer under oath all, and singular, the matters alleged in the Verified Complaint;

B.    That since the Defendants cannot be found within the District, as set forth in the Declaration of George M. Chalos (*attached hereto as Exhibit "6"*), and pursuant to Rule B and Rule E of the Supplemental Rules of Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B and Rule E of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all of the Defendants' tangible or intangible property or any other funds held by any garnishees in the district which are due and owing, or other property of, or for the benefit of, the Defendants, up to the amount of **USD 742,763.66** to secure and satisfy the Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B and Rule E answer the matters alleged in the Complaint;

C.    That Plaintiff may have such other, further and different relief as may be just and proper.

Dated: Oyster Bay, New York
   September 1, 2009

         CHALOS & CO, P.C.
         Attorneys for Plaintiff
         BERNHARD SCHULTE
         SHIPMANAGEMENT (L) LTD.

    By: _____
         George M. Chalos (GC-8693)
         123 South Street
         Oyster Bay, New York 11771
         Tel: (516) 714-4300
         Fax: (866) 702-4577
         Email: gmc@chaloslaw.com

EXHIBIT 1

| | |
|---|---|
| 1. Date of Agreement<br><br>**2nd May 2007** | **Eurasia Ship Management (Lump Sum) Agreement based on "SHIPMAN 98" of BIMCO**<br>**Part I**<br>**Palenque**                                    **M.T.** |
| 2. Owners (name, place of registered office and law of registry) (Cl. 1)<br>**Refined Products Seaways Limited**<br><br>Name<br>**80 Broad Street Monrovia Liberia**<br><br>Place of registered office<br>**Liberia**<br><br>Law of registry<br>**Liberia** | 3. Managers (name, place of registered office and law of registry) (Cl.1)<br><br><br>Name<br>**Eurasia International (L) Limited**<br><br>Place of registered office<br>**Labuan**<br><br>Law of registry<br>**Malaysia** |
| 4. Calendar day and calendar year of commencement of Agreement (Cl. 2)<br><br>**From the Date of Takeover of Vessel Management** | |
| 5. Crew Management (state "yes" or "no" as agreed) (Cl. 3.1)<br><br>**Yes** | 6. Technical Management (state "yes" or "no" as agreed) (Cl. 3.2)<br><br>**Yes** |
| 7. Commercial Management (state "yes" or "no" as agreed) (Cl. 3.3)<br><br>**No** | 8. Insurance Arrangements (state "yes" or "no" as agreed) (Cl.3.4)<br><br>**Yes, Hull and Machinery only for insured value US$ 15 Million** |
| 9. Accounting Services (state "yes" or "no" as agreed) (Cl. 3.5)<br><br>**Yes** | 10. Sale or purchase of the Vessel (state "yes" or "no" as agreed) (Cl. 3.6)<br><br>**No** |
| 11. Provisions (state "yes" or "no" as agreed) (Cl. 3.7)<br><br>**Yes** | 12. Bunkering (state "yes" or "no" as agreed) (Cl. 3.8)<br><br>**No** |
| 13. Chartering Services Period (only to be filled in if "yes" stated in Box 7) (Cl.3.3(I))<br><br>**N/A** | 14. Owners' Insurance (Cl. 6)<br><br>**See Clause 6** |
| 15. Annual Management Fee (state annual amount) (Cl. 8.1)<br><br>**USD120,000 per annum** | 16. Severance and Repatriation Costs(Cl. 18.9(ii))<br><br>**See Clause 18.9(ii)** |
| 17. Calendar day and calendar year of expiry of Agreement (if any)(Cl.17)<br><br>**See Clause 17** | |
| 18. Law and Arbitration (Cl.19)<br><br>**English Law to apply and LMAA Arbitration in London** | |
| 19. Notices (state postal and cable address, telex and telefax number for serving notice and communications to the Owners) (Cl. 20)<br><br>**Refined Products Seaways Limited**<br>**c/o Merchant Marine Management SA**<br>**5,K. Palaiologou Str.**<br>**Piraeus, 185 35 Greece**<br>**Tel : + 30 210 427 4061**<br>**Fax : + 30 210 427 4060**<br>**Email :** | 20. Notices (state postal and cable address, telex and telefax number for serving notice and communication to the Managers) (Cl. 20)<br><br>**Eurasia International (L) Limtied**<br>**c/o Eurasia International (Singapore) Pte Ltd**<br>**7 Temasek Boulevard**<br>**Suntec Tower 1 #32-03, Singapore 038987**<br>**Tel: + 65 6309 5000**<br>**Fax: + 65 6309 5039**<br>**Email: eurasia.singapore@eurasiagroup.com** |

It is mutually agreed between the party stated in Box 2 and the party stated in Box 3 that this Agreement consisting of PART I and PART II as well as Annexes "A" (Details of Vessel), "B" (Details of Crew) and "C" (Budget) attached hereto, shall be performed subject to the terms contained herein. In the event of a conflict of terms, the provisions of PART I and Annexes "A", "B" and "C" shall prevail over those of PART II to the extent of such conflict but no further.

| Signature(s) (Owners) | Signature(s) (Managers) |
|---|---|
| *N. Christodoulou*<br>*for and behalf*<br>*of the owners*<br><br>Signatory's name / job designation | **R. Bajpaee / Director**<br>Signatory's name / job designation |

PART II
**Eurasia Ship Management (Lump Sum) Agreement based on "SHIPMAN 98" of BIMCO**

**1.  Definitions**
In this Agreement save where the context otherwise requires, the following words and expressions shall have the meanings hereby assigned to them.

*"Owners"* means the party identified in Box 2.
*"Managers"* means the party identified in Box 3.
*"Vessel"* means the vessel details of which are set out in Annex "A" attached hereto.
*"Crew"* means the Master, officers and ratings of the numbers, ranks and nationalities specified in Annex "B" attached hereto as may be amended from time to time.
*"Crew Support Costs"* means all expenses of a general nature which are not particularly referable to any individual vessel for the time being managed by and which are incurred by the Managers for the purpose of providing an efficient and economic management service and, without prejudice to the generality of the foregoing, shall include the cost of crew standby pay, training schemes for officers and ratings, cadet training schemes, sick pay, study pay, recruitment and interviews.
*"Severance Costs"* means the costs which the employers are legally obliged to pay to or in respect of the Crew as a result of the early termination of any employment contract for service on the Vessel.
*"Crew Insurances"* means insurances against crew risks which shall include but not be limited to death, sickness, repatriation, injury, shipwreck unemployment indemnity and loss of personal effects.
*"Management Services"* means the services specified in sub-clauses 3.1 to 3.8 as indicated affirmatively in Boxes 5 to 12.
*"ISM Code"* means the International Management Code for the Safe Operation of Ships and for Pollution Prevention as adopted by the International Maritime Organisation (IMO) by resolution A.741 (18) as may be amended from time to time.
*"STCW 95"* means the International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1978, as amended in 1995 and as may be further amended from time to time.

**2.  Appointment of Managers**
2.1  With effect from the day and year stated in Box 4 and continuing unless and until terminated as provided herein, the Owners hereby appoint the Managers and the Managers hereby agree to act as the Managers of the Vessel.
2.2  If requested by the Owners, the Managers shall arrange for a familiarisation team to join the Vessel before the Managers take over the Vessel. The expenses for such familiarisation team shall be reimbursed by the Owners on an actual cost basis until the day of take-over.

**3.  Basis of Agreement**
Subject to the terms and conditions herein provided, during the period of this Agreement, the Managers shall carry out Management Services in respect of the Vessel as agents for and on behalf of the Owners. The Managers shall have authority to take such actions as they may from time to time in their absolute discretion consider to be necessary to enable them to perform this Agreement in accordance with sound ship management practice and the Managers shall protect and promote the interest of the Owners in all aspects relating to the provision of management service hereunder.
**3.1  Crew Management**
*(only applicable if agreed according to Box 5)*
3.1.1 The Managers shall provide suitable qualified Crew for the Vessel as required by the Owners in accordance with the STCW 95 requirements, provision of which includes but is not limited to the following functions:

(i)  selecting and engaging the Vessel's Crew and payroll arrangements;
(ii)  ensuring that the applicable requirements of the law of the flag of the Vessel are satisfied in respect of manning levels, rank, qualification and certification of the Crew and employment regulations including Crew's social insurance, discipline and other requirements;
(iii)  ensuring that all members of the Crew have passed a medical examination with a qualified doctor certifying that they are fit for the duties for which they are engaged and are in possession of valid medical certificates issued in accordance with appropriate Flag State requirements. In the absence of applicable Flag State requirements the medical certificates shall be dated not more than three calendar months prior to the respective Crew members leaving their countries of domicile and maintained for the duration of their service on board the Vessel;
(iv)  ensuring that the Crew shall have a command of the English language of a sufficient standard to enable them to perform their duties safely;
(v)  arranging transportation and repatriation of the Crew;
(vi)  training of the Crew and supervising their efficiency;
(vii)  conducting union negotiations.
3.1.2 The Owners shall pay to the Managers a Crew Management Lump Sum of United States Dollars Seventy Eight Thousand One Hundred and Ninety Seven only (US$78,197) per calendar month of which the first payment shall be made pro rata on the commencement of this Agreement from which the Managers shall pay:

(i)  all wages and allowances by way of remuneration of each member of the Crew of the Vessel, including, in the case of the Master and officers any remuneration for the overtime, and in the case of the remaining members of the Crew, remuneration for up 109 hours of overtime per calendar month;
(ii)  overlapping wages;
(iii)  provisioning and victualling costs;
(iv)  recruitment and document processing;
(v)  bank charges;
(vi)  Crew handling, joining and detaching port expenses;
(vii)  communication;
(viii)  Crew entertainment;
(ix)  travel costs;
(x)  ~~for Crew P&I deductibles claims up to a maximum of United States Dollars Only (US$          ) per illness/injury of each Crew member and social security contributions as required by the home country of the Crew members;~~
(xi)  miscellaneous Crew costs and Crew expenses reasonably incurred by the Managers in providing the Crew Management Services; and
(xii)  manning services fee,
provided that:
(a)  all Severance Costs for the Crew in the event of termination of this Agreement shall be paid from the sum payable under sub-clause 18.9(ii);
(b)  the Owners shall reimburse the Managers for any overtime costs incurred by the Managers in respect of any member of the Crew working more than 109 hours of overtime in any calendar month as evidenced by the Crew records of the Vessel;
(c)  all expenses whatsoever by way of additional insurance premium, bonuses to the Crew or otherwise which are incurred by the Managers in connection with the entry of the Vessel into a war zone or other area in which there is a war-like situation or civil commotion prevailing, which are in addition to the ordinary remuneration of the Crew covered as described above in this sub-clause 3.1 shall be reimbursed by the Owners; and

(d) the Owners hereby acknowledge that no representation is or has been made by the Managers (i) that the Crew on the Vessel at any time will continue in service while the Vessel is in a war or war-like zone or (ii) that the Crew will permit the entry of the Vessel into such area, but in the event of the Crew refusing to continue in service the Owners shall be entitled to terminate this Agreement under sub-clause 18.6.

3.1.3 Without prejudice to sub-clause 9.1, the Crew Management Lump Sum shall be adjusted at any time to take into account any changes in the nationalities, wages or working conditions of the Crew, if such change is made either upon the request of the Owners or as a result of any alterations in laws or regulations or as a result of an order by any court or tribunal or as a result of any trade union, guild or other action, strike or lockout.

3.1.4 The terms of the employment contracts of the Crew of the Vessel shall be consistent with the requirements as stipulated by the ITF/ (IBFAgreement) from time to time.

## 3.2 Technical Management
*(only applicable if agreed according to Box 6)*
The Managers shall provide technical management, which includes, but is not limited to, the following functions:

(i) provision of competent personnel to supervise the maintenance and general efficiency of the Vessel;

(ii) arrangement and supervision of dry docking, repairs, alterations and the upkeep of the Vessel to the standards reasonably required by the Owners provided that the Managers shall be entitled to incur the necessary expenditure to ensure that the Vessel will comply with the law of the flag of the Vessel and of the places where she trades, and all requirements and recommendations of the classification society;

(iii) arrangement of the supply of necessary stores, spares. ~~and lubricating oil; (Luboil will be arranged and paid for directly by Owners)~~

(iv) appointment of superintendents, surveyors and technical consultants as the Managers may consider from time to time to be necessary;

(v) development, implementation and maintenance of a Safety Management System (SMS) in accordance with the ISM Code (see sub-clauses 4.2 and 5.3);

(vi) One safety audits on the Vessel per calendar year, and;

(vii) Notifying the Owners of any extraordinary or non-budgeted expenditure in excess of USD 10,000/- in any given month.

## ~~3.3 Commercial Management~~
*~~(only applicable if agreed according to Box 7)~~*
~~The Managers shall provide the commercial operation of the Vessel, as required by the Owners, which includes, but is not limited to, the following function:~~

~~(i) providing chartering services in accordance with the Owners' instructions which include, but are not limited to, seeking and negotiating employment for the Vessel and the conclusion (including the execution thereof) of charter parties or other contracts relating to the employment of the Vessel. If such a contract exceeds the period stated in Box 13, consent thereto in writing shall first be obtained from the Owners.~~

~~(ii) arranging of the proper payment to Owners or their nominees of all hire and/or freight revenues or other moneys of whatsoever nature to which Owners may be entitled arising out of the employment of or otherwise in connection with the Vessel.~~

~~(iii) providing voyage estimates and accounts and calculating of hire, freights, demurrage and/or despatch moneys due from or due to the charterers of the Vessel;~~

~~(iv) issuing of voyage instructions;~~

~~(v) appointing agents;~~

~~(vi) appointing stevedores;~~

~~(vii) arranging surveys associates with the commercial operation of the Vessel.~~

## 3.4 Insurance Arrangements
*(only applicable if agreed according to Box 8)*
The Managers shall arrange insurances in accordance with Clause 6 and the reasonable instructions of the Owners.

## 3.5 Accounting Services
*(only applicable if agreed according to Box 9)*
The Managers shall:

(i) establish an accounting system which meets the reasonable requirements of the Owners, provide regular accounting services and supply regular reports and records; and

(ii) maintain the records of all costs and expenditure incurred as well as data necessary or proper for the settlement of accounts between the parties.

## ~~3.6 Sale or Purchase of the Vessel~~
*~~(only applicable if agreed according to Box 10)~~*
~~The Managers shall, in accordance with the Owners' instructions, supervise the sale or purchase of the Vessel, including the performance of any sale or purchase agreement, but not negotiation of the same.~~

## 3.7 Provisions *(only applicable if agreed according to Box 11)*
The Managers shall arrange for the supply of provisions.

## ~~3.8 Bunkering~~ *~~(only applicable if agreed according to Box 12)~~*
~~The Managers shall arrange for the provision of bunker fuel of the quality specified by the Owners as required for the Vessel's trade.~~

## 4. Managers' Obligations
4.1 The Managers undertake to exercise all reasonable care and skill in providing the agreed Management Services as agents for and on behalf of the Owners in accordance with sound ship management practice and in protecting and promoting the interests of the Owners in all matters relating to the provision of services hereunder. Provided, however, that the Managers in the performance of their management responsibilities under this Agreement shall be entitled to have regard to their overall responsibility in relation to all vessels as may from time to time be entrusted to their management and in particular, but without prejudice to the generality of the foregoing, the Managers shall be entitled to allocate available supplies, manpower and services in such manner as in the prevailing circumstances the Managers in their absolute discretion consider to be fair and reasonable.

4.2 Where the Managers are providing Technical Management in accordance with sub-clause 3.2, they shall procure that the requirements of the law of the flag of the Vessel are satisfied and they shall in particular be deemed to be the "Company" as defined by the ISM Code, assuming the responsibility for the operation of the Vessel and taking over duties and responsibilities imposed by the ISM Code when applicable.

## 5. Owners' Obligations
5.1 The Owners shall pay all sums due to the Managers punctually in accordance with terms of this Agreement.

5.2 Where the Managers are providing Technical Management in accordance with sub-clause 3.2, the Owners shall:

(i) procure that all officers and ratings supplied by them or on their behalf comply with the requirements of STCW 95;

(ii) instruct such officers and ratings to obey all reasonable orders of the Managers in connection with the operation of the Managers' safety management system.

5.3 Where the Managers are not providing Technical Management in accordance with sub-clause 3.2, the Owners shall procure that the requirements of the law of the flag of the Vessel are satisfied and that they, or such entity as may be appointed by them and identified to the Managers, shall be deemed to be the "Company" as defined by the ISM Code assuming the responsibility for the operation of the Vessel and taking over the duties and responsibilities imposed by the ISM Code when applicable.

5.4 The Owners shall be liable to the Managers for a default interest at a compound rate of 10% per annum on the outstanding amount for non-payment of any money by the Owners to the Managers under or in connection with this Agreement.

## 6. Insurance Policies

The Owners shall procure that throughout the period of this Agreement:

6.1 at the Owners' expenses, the Vessel is insured for not less than her sound market value or entered for her full gross tonnage, as the case may be, for:

(i) usual hull and machinery marine risks (including crew negligence) and excess liabilities;

(ii) protection and indemnity risks (including pollution risks and Crew Insurances), and;

(iii) war risks (including protection and indemnity and crew risks);

in accordance with the best practice of prudent owners of vessels of a similar type to the Vessel, with first class insurance companies, underwriters or associations ("the Owners' Insurances");

6.2 all premiums and calls on the Owners' Insurance are paid promptly by their due date,

6.3 the Owners' Insurances name the Managers and, subject to underwriters' agreement, any third party designated by the Managers as joint assureds, with full cover at the Owners' expenses, with the Owners obtaining cover in respect of each of the insurances specified in sub-clause 6.1.

6.4 written evidence is provided, to the reasonable satisfaction of the Managers, of their compliance with their obligations under Clause 6 within a reasonable time of the commencement of the Agreement, and of each renewal date and, if specifically requested, of each payment date of the Owners' Insurances.

## 7. Income Collected and Expenses Paid on Behalf of Owners

7.1 All moneys collected by the Managers under the terms of this Agreement (other than moneys payable by the Owners to the Managers) shall be held to the credit of the Owners.

7.2 All expenses incurred by the Managers under the terms of this Agreement on behalf of the Owners (including expenses as provided in Clause 8) shall be debited against the Owners.

## 8. Annual Management Fee

8.1 Subject to sub-clause 9.1, the Owners shall pay to the Managers for their services as Managers under this Agreement an annual management fee as stated in Box 15 which shall be payable by equal calendar-monthly instalments in advance, the first instalment being payable pro rata on the commencement of this Agreement (see Clause 2 and Box 4) and subsequent instalments being payable every calendar month.

8.2 The Owners shall pay to the Managers for their services rendered before the commencement of this Agreement a Pre-delivery Management Fee of United States Dollars Ten Thousand only (US$ 10,000) on or before commencement of the Agreement, and all actual costs incurred in salaries, travel, accommodation and incidentals for familarisation crew sent onboard the vessel prior to and upto commencement date of this agreement.

8.3 The Managers shall, at no extra cost to the Owners, provide their own office accommodation, office staff, facilities and stationery. Without limiting the generality of Clause 7 the Owners shall reimburse the Managers for postage and communication expenses, travelling, and other out of pocket expenses properly incurred by the Managers in pursuance of their provision of the Management Services.

8.4 On termination of this Agreement other than in accordance with the provisions of sub-clause 18.2, the Owners shall pay to the Managers a sum equal to one calendar monthly instalment of the last management fee payable to the Managers according to sub-clause 8.1 towards the Managers' costs of, inter alia, preparation of accounts, finalising the statement of

account, settlement of invoices, handling agents' disbursements, radio account processing and handling claims in respect of the Owners' Insurances.

8.5 Lay-up

If the Owners decide to lay-up the Vessel whilst this Agreement remains in force and such lay-up lasts for more than three calendar months, an appropriate reduction of the annual management fee for the period exceeding three calendar months until one calendar month before the Vessel is again put into service shall be mutually agreed between the parties.

8.6 Discounts and Commissions

Unless otherwise agreed in writing all discounts and commissions obtained by the Managers in the course of the management of the Vessel shall be credited to the Owners.

8.7 Preliminary Remittance

To enable the Managers to run the Vessel the Owners shall remit on the commencement of this Agreement one-twelfth of the total annual budget figure as set out in Annex "C".

8.8 Victualling Costs

For meals and snacks served onboard to Owners' and/or charterers' representatives, pilots or port authorities a rate of United States Dollars Three Point Five (USD3.5) per meal and United States Dollars Two (USD2.0) per snack shall be charged to the Owners.

8.9 Bank Account

All remittances to the Managers shall be paid net of bank charges to the bank account of the Manager with:

VIA:

The Hongkong & Shanghai Banking Corporation Ltd
1 Queens Road Central
Hong Kong
US$ Account No. 808-194013-274
Swift Code: HSBCHKHH

And in making such remittance the Owners shall ensure that the name of the Vessel be accurately and unambiguously given in the transfer instructions.

8.10 Calendar-monthly Statement

The statement of account for a calendar month (with items not included in the Crew Management Lump Sum supported by original vouchers) shall be dispatched by the Managers no later than the end of the ensuing calendar month.

## 9. Budgets and Management of Funds

9.1 The Managers shall present to the Owners calendar-yearly a budget in such form as the Owners require. The first budget for part of, the whole of or more than a complete calendar year is set out in Annex "C" hereto and shall be subject to review by both parties after three calendar months. Subsequent budgets for part of or the whole of a complete calendar year shall be prepared by the Managers and submitted to the Owners no later than the immediately preceding October (see Clause 2 and Box 4) and any proposed revised Annual Management Fee and any proposed revised Crew Management Lump Sum shall be presented therein.

9.2 The Owners shall indicate to the Managers their acceptance and approval of the annual budget within one calendar month of presentation and in the absence of any such indication the Managers shall be entitled to assume that the Owners have accepted the proposed budget.

9.3 Following the agreement of the budget, the Managers shall prepare and present to the Owners their estimate of the working capital requirement of the Vessel and the Managers shall each calendar month up-date this estimate. Based thereon, the Managers shall on or before 20th of each calendar month request the Owners in writing for the funds required to run the Vessel for the ensuing calendar month, including the payment of any occasional or extraordinary item of expenditure, such as emergency repair costs, additional insurance premiums, bunkers, provisions or any other costs of the previous calendar month not yet reimbursed by the Owners.

Such funds shall be received by the Managers within ten running days after the receipt by the Owners of the Managers' written request and shall be held to the credit of the Owners.

9.4 The Managers shall produce a comparison between budgeted and actual income and expenditure of the Vessel in the form of a variance report as required by the Owners calendar-monthly.

9.5 Notwithstanding anything contained herein to the contrary, the Managers shall in no circumstances be required to use or commit their own funds to finance the provision of the Management Services.

9.6 The Owners shall provide to the Managers at the commencement of this Agreement a bank guarantee (in such form as may be approved of by the Managers) or security deposit for a sum of USD Two Hundred Thousand (USD200,000), which the Managers shall be entitled to call upon if funds are not received in accordance with clause 9.3 above

## 10. Managers' Right to Sub-Contract

10.1 The Managers shall have the right to sub-contract any of their obligations hereunder, including those mentioned in sub-clause 3.1. In the event of such a sub-contract the Managers shall remain fully liable for the due performance of their obligations under this Agreement.

10.2 Both the Managers and their sub-contractors shall have the right to select suppliers of supplies, manpower and services whatsoever in the course of performance of this Agreement.

## 11. Responsibilities

11.1 Force Majeure – Neither the Owners nor the Managers shall be under any liability for any failure to perform any of their obligations hereunder by reason of any cause whatsoever of any nature or kind beyond their reasonable control.

11.2 Liability to Owners – (i) Without prejudice to sub-clause 11.1, the Managers shall be under no liability whatsoever to the Owners for any loss, damage, delay or expense of whatsoever nature, whether direct or indirect, (including but not limited to loss of profit arising out of or in connection with detention of or delay to the Vessel) and howsoever arising in the course of performance of the Management Services UNLESS the same is proved to have resulted solely from the negligence, gross negligence or wilful default of the Managers or their employees, or agents or sub-contractors employed by them in connection with the Vessel, in which case (save where loss, damage, delay or expense has resulted from the Managers' personal act or omission committed with intent to cause the same or recklessly and with knowledge that such loss, damage, delay or expense would probably result) the Managers' liability for each incident or (if applicable) series of incidents giving rise to a claim or claims shall never exceed a total of ten times the annual management fee payable hereunder.

(ii) Subject to sub-clause 3.1 and notwithstanding anything that is or may appear to the contrary in this Agreement, the Managers shall not be liable for any negligence, gross negligence or wilful default of the Crew.

11.3 Indemnity – Except to the extent and solely for the amount therein set out that the Managers would be liable under sub-clause 11.2, the Owners hereby undertake to keep the Managers and their employees, agents and sub-contractors indemnified and to hold them harmless against all actions, proceedings, claims, demands or liabilities whatsoever or howsoever arising which may be brought against them or incurred or suffered by them arising out of or in connection with the performance of this Agreement, and against and in respect of all costs, losses, damages and expenses (including legal costs and expenses on a full indemnity basis) which the Managers may suffer or incur (either directly or indirectly) in the course of the performance of this Agreement.

11.4 "Himalaya" – It is hereby expressly agreed that no employee or agent of the Managers (including every sub-contractor from time to time employed by the Managers) shall

in any circumstances whatsoever be under any liability whatsoever to the Owners for any loss, damage or delay of whatsoever kind arising or resulting directly or indirectly from any act, neglect or default on his part while acting in the course of or in connection with his employment and, without prejudice to the generality of the foregoing provision in this Clause 11, every exemption, limitation, condition and liberty herein contained and every right, exemption from liability, defence and immunity of whatsoever nature applicable to the Managers or to which the Managers are entitled hereunder shall also be available and shall extend to protect every such employee or agent of the Managers acting as aforesaid and for the purpose of all the foregoing provisions of this Clause 11 the Managers are or shall be deemed to be acting as agent or trustee on behalf of and for the benefit of all persons who are or might be their servants or agents from time to time (including sub-contractors as aforesaid) and all such persons shall to this extent be or be deemed to be parties to this Agreement.

## 12. Documentation

Where the Managers are providing Technical Management in accordance with sub-clause 3.2 and/or Crew Management in accordance with sub-clause 3.1, they shall make available, upon the Owners' request, all documentation and records related to the Safety Management System (SMS) and/or the Crew which the Owners need in order to demonstrate compliance with the ISM Code and STCW 95 or to defend a claim against a third party.

## 13. General Administration

13.1 The Managers shall handle and settle all claims arising out of the Management Services hereunder and keep the Owners informed regarding any incident of which the Managers become aware, which gives or may give rise to claims or disputes involving third parties.

13.2 The Managers shall, as instructed by the Owners, bring or defend actions, suits or proceedings in connection with matters entrusted to the Managers according to this Agreement.

13.3 The Managers shall also have power to obtain legal or technical or other outside expert advice in relation to the handling and settlement of claims and disputes or all other matters affecting the interests of the Owners in respect of the Vessel.

13.4 The Owners shall arrange for the provision of any necessary guarantee bond or other security.

13.5 Any costs reasonably incurred by the Managers in carrying out their obligations according to Clause 13 shall be reimbursed by the Owners.

## 14. Accounts

The Managers shall at all times maintain and keep true and correct accounts of the Vessel and shall make the same available for inspection by the Owners at such times as may be mutually agreed. On the termination, for whatever reasons, of this Agreement, the Managers shall release to the Owners, if so requested, the originals where possible, or otherwise certified copies at the Owners' expenses, of all such accounts and all documents specifically relating to the Vessel and her operation.

## 15. Inspection of Vessel

15.1 By Owners

The Owners shall have the right at any time after giving reasonable notice to the Managers to inspect the Vessel for any reason they consider necessary.

15.2 By Managers

The Owners shall reimburse the costs to the Managers for each day from and including the twenty-second day of visits of superintendents to the Vessel:

(i)   per calendar year for carrying out inspections and/or surveys and/or supervising repairs and maintenance of the Vessel; or

(ii)  per 2.5 calendar years for supervising dry-docking of the Vessel,

provided that any additional day required for such visits with the Owners' written consent shall be charged at a rate of United States Dollars Two Hundred and Fifty (US$ 250) per day provided that both the day the superintendent leaves the office and the day he returns to the place of his office shall be counted as days of such visits. The Managers shall forward to the Owners every three calendar months a detailed Vessel inspection report.

## 16. Compliance with Law and Regulations

The Managers will not do or permit to be done anything which might cause any breach or infringement of the laws and regulations of the Vessel's flag, or of the places where she trades.

## 17. Duration of the Agreement

This Agreement shall come into effect on the day and year stated in Box 4 and shall continue until the date (if any) stated in Box 17. Thereafter it shall continue until terminated under Clause 18.

## 18. Termination

### 18.1 Owners' default

(i)   The Managers shall be entitled to terminate this Agreement with immediate effect by notice in writing if any moneys payable by the Owners under this Agreement shall not have been received in the Managers' nominated account within ten running days of receipt by the Owners of the Managers' written request or if the Vessel is arrested as a result of any legal proceedings by any creditor of the Owners or repossessed by the Mortgagees.

(ii)  If the Owners:

(a)   Fail to meet their obligations under sub-clauses 5.2 and 5.3 of this Agreement for any reason within their control, or

(b)   Proceed with the employment of or continue to employ the Vessel in the contraband, blockade running, or in an unlawful trade, or on a voyage which in the reasonable opinion of the Managers is unduly hazardous or improper,

the Managers may give notice of the default to the Owners, requiring them to remedy it as soon as practically possible. In the event that the Owners fail to remedy it within a reasonable time to the reasonable satisfaction of the Managers, the Managers shall be entitled to terminate this Agreement with immediate effect by notice in writing.

### 18.2 Managers' Default

If the Managers fail to meet their obligations under Clauses 3 and 4 of this Agreement for any reason within the control of the Managers, the Owners may give notice to the Managers of the default, requiring them to remedy it as soon as practically possible. In the event that the Managers fail to remedy it within a reasonable time to the reasonable satisfaction of the Owners, the Owners shall be entitled to terminate this Agreement with immediate effect by notice in writing.

### 18.3 Extraordinary Termination

This Agreement shall be deemed to be terminated in the case of the sale of the Vessel or if the Vessel becomes a total loss or is declared as a constructive or compromised or arranged total loss or is requisitioned.

### 18.4 For the purpose of sub-clause 18.3 hereof

(i)   the date upon which Vessel is to be treated as having been sold or otherwise disposed of shall be the date on which the Owners cease to be registered as Owners of the Vessel;

(ii)  the Vessel shall not be deemed to be lost unless either she has become an actual total loss or agreement has been reached with her underwriters in respect of her constructive, compromised or arranged total loss or if such agreement with her underwriters is not reached it is adjudged by a competent tribunal that a constructive loss of the Vessel has occurred.

### 18.5 This Agreement shall terminate automatically and immediately in the event of an order being made or resolution passed for the winding up, dissolution, liquidation or bankruptcy of either party (otherwise than for the purpose of reconstruction or amalgamation) or if a receiver is appointed, or if it suspends payment, ceases to carry on business or make any special arrangement or composition with its creditors.

### 18.6 Termination on Two Calendar Months' Notice

Without prejudice to the rights under sub-clauses 18.1-18.5, either party shall be entitled to terminate this Agreement by two calendar months' notice in writing until the expiry of which notice this Agreement shall continue.

### 18.7 The termination of this Agreement shall be without prejudice to all rights accrued or due between the parties prior to the date of termination.

### 18.8 On termination of this Agreement, the Managers shall forthwith deliver or procure to be delivered to the Owners all records, documents, accounts and other properties of every description in their possession or under their control relating to the Vessel whether or not the same were originally supplied or obtained from the Owners. The Managers shall be entitled to retain copies of the same if they in their sole and absolute discretion consider desirable to do so.

### 18.9 On termination of this Agreement and without prejudice to the other provisions of this Agreement, the Owners shall pay to the Managers (i) a sum equal to the cost of the provisions and bonded stores remaining on board the Vessel which are the properties of the Managers and (ii) a sum equal to the last calendar-monthly Crew Lump Sum under sub-clause 3.1 towards the Severance Costs

## 19. Law and Arbitration

This Agreement shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Agreement shall be referred to arbitration in London in accordance with the Arbitration Act 1996 as may be amended from time to time save to the extent necessary to give effect to the provisions of this Clause. The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced. The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the 14 days specified. If the other party does not appoint its own arbitrator and gives no notice that it has done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement. Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator. In cases where neither the claim nor any counterclaim exceeds the sum of USD50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

## 20. Notices

### 20.1 Any notice to be given by either party to the other party shall be in writing and may be sent by fax, telex, registered or recorded mail or by personal service.

### 20.2 The addresses of the parties for service of such communication shall be as stated in Boxes 19 and 20, respectively.

**21.Costs**

For the avoidance of doubt, the Owners and the Managers shall bear their own and respective costs and disbursements incurred and to be incurred in connection with the negotiations, preparation, execution, delivery, notarisation and other means of legalisation of this Agreement.

| Eurasia International (L) Limited | Principal | : |
| Malaysia | Vessel | : M.T. Palenque |
| Ship Management Agreement | Page | : 7/9 |

**Annex "A" (Details of Vessel or Vessels) To**
**The Baltic And International Maritime Council (BIMCO)**
**Standard Ship Management Agreement - Code Name: "Shipman 98"**

Date of Agreement          :   2 May 2007

Name of Vessel            :   M.T. Palenque

Particulars of Vessel

| | | |
|---|---|---|
| Type | : | Product Tanker |
| Year Built | : | 1987 |
| Gross Tonnage | : | 23,127 |
| Deadweight | : | 37,574 |
| Flag | : | Liberia |
| Call Sign | : | A8FX3 |
| IMO Number | : | 8312356 |
| Official Number | : | 12509 |

| Eurasia International (L) Limited | Principal | : |
| Malaysia | Vessel | : M.T. Palenque |
| Ship Management Agreement | Page | : 8/9 |

**Annex "B" (Details of Crew) To**
**The Baltic and International Maritime Council (BIMCO)**
**Standard Ship Management Agreement – Code Name: "Shipman 98)**

| Client's Name | : | |
| Name of Vessel | : | M.T. Palenque |
| Managing Company | : | Eurasia International (L) Limited |
| Date of Agreement | : | 2 May 2007 |

Crew Complement:

| No. | Rank | Nationality |
|---|---|---|
| 1 | Master | Indian Sub-Continent / East European |
| 1 | Chief Engineer | Indian Sub-Continent / East European |
| 1 | Chief Officer | Indian Sub-Continent / East European |
| 1 | 2nd Engineer | Indian Sub-Continent / East European |
| 1 | 2nd Officer | Indian Sub-Continent / East European |
| 1 | 3rd Engineer | Indian Sub-Continent / East European |
| 1 | 3rd Officer | Indian Sub-Continent / East European |
| 1 | EO | Indian Sub-Continent / East European |
| 1 | TME | Indian Sub-Continent / East European |
| 1 | Deck Cadet | Indian Sub-Continent / East European |
| 1 | Bosun | Indian Sub-Continent |
| 1 | Fitter | Indian Sub-Continent |
| 1 | Pumpman | Indian Sub-Continent |
| 1 | Chief Cook | Indian Sub-Continent |
| 1 | A/B | Indian Sub-Continent |
| 1 | A/B | Indian Sub-Continent |
| 1 | A/B | Indian Sub-Continent |
| 1 | OS | Indian Sub-Continent |
| 1 | Tr. OS | Indian Sub-Continent |
| 1 | Tr. Wiper | Indian Sub-Continent |
| 1 | Oiler | Indian Sub-Continent |
| 1 | Oiler | Indian Sub-Continent |
| 1 | Messman | Indian Sub-Continent |

| 23 | Total Number of Crew on Board |



| Eurasia International (L) Limited | Principal | : |
|---|---|---|
| Malaysia | Vessel | : M.T. Palenque |
| Ship Management Agreement | Page | : 9/9 |

**Annex "C" (Budget) To**
**The Baltic and International Maritime Council (BIMCO)**
**Standard Ship Management Agreement - Code Name 'Shipman 98"**

Date of Agreement   : 2 May 2007

Managers' Budget for the first year with effect from the Commencement Date of this Agreement:

Per Month Budget

Valid Until: 31st December 2007

| Items: | All in USD |
|---|---|
| Crew Management Lumpsum | 78,197 |
| Stores (including paints, chemicals and gases) | 7,000 |
| Spares | 8,000 |
| Repair & Maintenance (including class survey) | 5,800 |
| General (including ISM Certification) | 4,300 |
| Oil Major | N/A |
| Management Fee | 10,000 |
| | |
| Total per month | 113,297 |

(United States Dollars One Hundred and Thirteen Thousand Two Hundred and Ninety Seven Only)

Notes:
1. The above Monthly budget does not include Lubricating oil, which will be directly arranged by Owners.
2. The above monthly budget does not include drydock costs and insurance costs which is to be separately discussed, agreed and settles by Owners.
3. The above monthly budget is subject to review after three months of vessel takeover.
4. Costs and fees for Oil Majors vetting inspections have not been budgeted at this time. To be done after more detailed knowledge of vessel and discussion with Owners.



EXHIBIT 2

| Bernhard Schulte Shipmanagement (L) Ltd. | Date : 01/01/2008 |
| | Page : 1/1 |
| Subject: Addendum No. 01 | Vessel : M.T. Palenque |

## ADDENDUM NO. 01

### TO THE
### SHIP MANAGEMENT AGREEMENT DATED 2nd May 2007
### (as the Agreement)

between

### REFINED PRODUCTS SEAWAYS LIMITED
### (as Owners)

and

### BERNHARD SCHULTE SHIPMANAGEMENT (L) LIMITED
### (as Managers)

### FOR M.T. "PALENQUE"

It is hereby confirmed that with effect from 1st January 2008, the company name of the Managers on the relevant boxes and clauses on the Agreement shall be changed from "Eurasia International (L) Limited" to "Bernhard Schulte Shipmanagement (L) Limited".

Furthermore, correspondence address of the Managers shall be amended to:-

Bernhard Schulte Shipmanagement (India) Private Limited
401 Olympia, 4th Floor, Hiranandani Gardens,
Powai, Mumbai 400076, India
Tel: 91 22 4001 7300
Fax: 91 22 4001 7333

All other terms and conditions of the Ship Management Agreement dated 2nd May 2007 remain unchanged as mutually agreed.

IN WITNESS WHEREOF, the parties have hereto signed this Addendum dated 1st January 2008.



For Refined Products Seaways Ltd

(as Owners)



for Bernhard Schulte Shipmanagement (L) Ltd

R. Bajpaee        R. Korivi
Director          Director
    (as Managers)

EXHIBIT 3



Payment credit advice

ATTN: CANDY TAM
BERNHARD SCHULTE SMGT(L)-
2602 K WAH CENTRE
191 JAVA ROAD NORTH POINT
HONG KONG

Our ref:        RBSSE2I02480505
Your ref:       MV PALENQUE/STL INV:SM/PLO/FEB'09/
Date:           9th February 2009
Time:           15:06:30
Delivery ref:   090209BKTRUS33AXXX9830668011

In accordance with instructions received, we have arranged for your account to be credited.

Beneficiary name:   BERNHARD SCHULTE SHIPMANAGEMENT (L)
Account:            BSINMMM-USDA
Amount credited:    USD    96,000.00

By order of:
MERCHANT MARINE MANAGEMENT (3M) S.A
5 K. PAPEOLOGOU STR PIRAEUS 18535

Value date:     9th February 2009

On instructions from :
FBB-FIRST BUSINESS BANK S.A.
91, MICHALAKOPOULOU STREET
ATHENS
GREECE

Reference:
C494674BBK02090

Payment details:
MV PALENQUE/STL INV:SM/PLO/FEB'09/
001-002

Transactional information:
Amount received:                    USD    95,000.00
Exchange Rate:
Deal Reference:
RBS commission charges:                     0.00
RBS commission charges information:
Original ordered amount:
Senders charges:
Charges exchange:

Funds can be reclaimed by the Bank up to 9.00 AM on the value date

The Royal Bank of Scotland plc is registered in Scotland No 90312. Registered office: 36 St Andrew Square, Edinburgh, EH2 2YB
Regulated by the Financial Services Authority
Agency agreement and banking services members of The Royal Bank of Scotland Group

EXHIBIT 4



Payment credit advice

ATTN: CANDY TAM                          Our ref:        RBSSE2I02544375
BERNHARD SCHULTE S'MGT(L)-               Your ref:       MV PALENQUE/ON ACCOUNT
2002 K WAH CENTRE                        Date:           7th April 2009
191 JAVA ROAD NORTH POINT                Time:           14:28:06
HONG KONG                                Delivery ref:   090407BKTRUS33AXXXS884478521

In accordance with instructions received, we have arranged for your account to be credited.

Beneficiary name:  BERNHARD SCHULTE SHIPMANAGEMENT (L)
Account:           BSINMMM-USDA
Amount credited:   USD         100,000.00        Value date:      7th April 2009
By order of:                                     On instructions from :
MELODIA SHIPPING INC                             FBB-FIRST BUSINESS BANK S.A.
5 K PALEOLOGOU STR 18535 PIRAEUS GR              91, MICHALAKOPOULOU STREET
                                                 ATHENS
                                                 GREECE

Reference:                                       Payment details:
C483992BBK04070                                  MV PALENQUE/ON ACCOUNT

Transactional information:
Amount received:              USD      100,000.00
Exchange Rate:
Deal Reference:
RBS commission charges:                 0.00
RBS commission charges information:
Original ordered amount:
Senders charges:
Charges exchange:

Funds can be reclaimed by the Bank up to 9.00 AM on the value date

The Royal Bank of Scotland plc is registered in Scotland No 90312. Registered Office: 36 St Andrew Square, Edinburgh EH2 2YB
Regulated by the Financial Services Authority
Agency agreement exist between members of The Royal Bank of Scotland Group

EXHIBIT 5

Wednesday 22 of Jul 2009, RBS                    —>                    Page 1 of

# Facsimile

To:       ATTN: CANDY TAM
Fax No:   0085225616803
Date:     22nd July 2009          Time: 12:42

**The Royal Bank of Scotland**

Please speak to your usual payment contact point if this facsimile transmission is incomplete or illegible.
This message is confidential and for use by the addressee only.
The contents are not to be disclosed to anyone other than the addressee.

## PAYMENT CREDIT ADVICE

ATTN. CANDY TAM
RAMA HOLDINGS (L) LIMITED
2602 K WAH CENTRE
191 JAVA ROAD NORTH POINT
HONG KONG

Our ref.    RBSSE2I02661434
Your ref:
Date.       22nd July 2009
Delivery    090722BKTRUS33AXXX9080806206
ref:

In accordance with instructions received, we have arranged for your account to be credited.

Beneficiary name:  RAMA HOLDINGS (L) LIMITED
Account:           RAMAHOL -USD-A
Amount credited:   USD 181.500.00                    Value date:  22nd July 2009

By order of :                           On instructions from :
MELODIA SHIPPING INC                    FBB-FIRST BUSINESS BANK S.A.
5 K PALEOLOGOU STR 18535 PIRAEUS GR     91, MICHALAKOPOULOU STREET
                                        ATHENS
                                        GREECE

Reference:                              Payment details:
C8948/588RW/2209                        MV PALENQUE/FUNDS NEEDED FOR
                                        VESSEL'S INTENDEN NEXT WEEK VOYAGE

## Transactional information:

Amount received:        USD 181,500.00

Rate:
Currency exchange contract:

RBS commission charges:     0.00

Funds can be reclaimed by the Bank up to 9.00 AM on the value date

The Royal Bank of Scotland plc
Registered in Scotland No 90317
Registered Office: 36 St Andrew Square
Edinburgh EH2 2YB

Authorised and regulated by the Financial Services Authority

EXHIBIT 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
BERNHARD SCHULTE SHIPMANAGEMENT
(L) LIMITED,

|  |  |  |
|---|---|---|
|  | Plaintiff, | 09 CV |
| -v- |  | **ATTORNEY'S DECLARATION** |
|  |  | **THAT DEFENDANTS CANNOT BE** |
| REFINED PRODUCTS SEAWAYS LIMITED, | | **FOUND IN THE DISTRICT** |
| MERCHANT MARINE MANAGEMENT S.A., | | |
| and MELODIA SHIPPING INC., | | |
|  | Defendants. | |

------------------------------------------------------------------x

This declaration is executed by **George M. Chalos, Esq.**, counsel for the Plaintiff,

BERNHARD SCHULTE SHIPMANAGEMENT (L) LIMITED, in order to secure the issuance

of a Summons and Process of Maritime Attachment and Garnishment in the above-entitled, in

personam, Admiralty cause.

Pursuant to 28 U.S.C. §1746, **George M. Chalos, Esq.**, declares under the penalty of

perjury:

I am a Member of the firm of CHALOS & CO, P.C., attorneys for Plaintiff in the above

referenced matter.

I am familiar with the circumstances of the Verified Complaint, and I submit this

declaration in support of Plaintiff's request for the issuance of Process of Maritime Attachment

and Garnishment of the property of the defendants, REFINED PRODUCTS SEAWAYS

LIMITED, MERCHANT MARINE MANAGEMENT S.A., and MELODIA SHIPPING INC.,

pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the

Federal Rules of Civil Procedure.

I have personally inquired or have directed inquiries into the presence of the defendants

in this District.

Chalos & Co. Ref: 2140.002

I have personally checked with the office of the Secretary of State of the State of New York, using the Secretary of State's Division of Corporations database, and I have determined that, as of September 1, 2009, the defendants are not incorporated pursuant to the laws of New York, and have not nominated any agent for the service of process within the Southern District of New York.

I have inquired of Verizon Telephone Company whether the defendants can be located within this District. The Verizon Telephone Company has advised me that the defendants do not have any telephone number listings within this District.

I have further consulted with several other telephone directories on the internet, and I have found no separate telephone listings or addresses for the defendants within this District.

I have engaged in a Google search as to whether the defendants can be located within this District. The Google search results did not provide any information that defendants are found in this District.

I am unaware of any general or managing agent(s) within this District for the defendants.

In that I have been able to determine that the defendants have not appointed an agent for service of process within the Southern District of New York and that I have found no indication that the defendants can be found within this District for the purposes of Rule B, I have formed a good faith belief that the defendants do not have sufficient contacts or business activities within this District and does not have any offices or agents within this District to defeat maritime attachment under Rule B of the Supplemental Rules for Admiralty and Maritime Claims as set forth in the Federal Rules of Civil Procedure.

It is my belief, based upon my own investigation that the defendants, REFINED PRODUCTS SEAWAYS LIMITED, MERCHANT MARINE MANAGEMENT S.A., and MELODIA SHIPPING INC., cannot be found within this District for the purposes of Rule B of

the Supplemental Rules of Certain Admiralty and Maritime Claims of the Federal Rules of Civil

Procedure.


Dated: Oyster Bay, New York
      September 1, 2009

                      CHALOS & CO, P.C.
                      Attorneys for Plaintiff
                      BERNHARD SCHULTE
                      SHIPMANAGEMENT (L) LIMITED

      By:    _____

                      George M. Chalos (GC-8693)
                      123 South Street
                      Oyster Bay, New York 11771
                      Tel: (516) 714-4300
                      Fax: (866) 702-4577
                      Email: gmc@chaloslaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

BERNHARD SCHULTE SHIPMANAGEMENT
(L) LIMITED,

                                        Plaintiff,              09 CV

-v-
                                                               **VERIFICATION OF**
                                                               **COMPLAINT**
REFINED PRODUCTS SEAWAYS LIMITED,
MERCHANT MARINE MANAGEMENT S.A., and
MELODIA SHIPPING INC.,

                                        Defendants.
------------------------------------------------------------------x

     Pursuant to 28 U.S.C. §1746, GEORGE M. CHALOS, Esq., declares under the penalty of
perjury:

    1.    I am a Member of the law firm of CHALOS & CO, P.C., counsel for the Plaintiff,

BERNHARD SCHULTE SHIPMANAGEMENT (L) LIMITED, herein;

    2.    I have read the foregoing Verified Complaint and know the contents thereof; and

    3.    I believe the matters to be true based on documents and information obtained from

employees and representatives of the Plaintiff through its agents, underwriters and attorneys.

    4.    The reason that this verification was made by deponent and not by the Plaintiff is

because Plaintiff is a foreign corporation, whose officers are not in this district, and whose

verification cannot be obtained within the time constraints presented by the circumstances of this

case.

    I declare under penalty of perjury that the foregoing is true and correct.

Dated:  Oyster Bay, New York
        September 1, 2009

                        CHALOS & CO, P.C.
                        Attorneys for Plaintiff
                        BERNHARD SCHULTE
                        SHIPMANAGEMENT (L) LIMITED

            By:    _____
                        George M. Chalos (GC-8693)
                        123 South Street
                        Oyster Bay, New York 11771
                        Tel: (516) 714-4300
                        Fax: (866) 702-4577
                        Email: gmc@chaloslaw.com